UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RAYMOND CHARLES MCDONNELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:15-cv-30080-KAR |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF
THE COMMISSIONER
(Dkt. Nos. 11 & 15)
June 28, 2016

ROBERTSON, U.S.M.J.

I.      Introduction

This is a request by Plaintiff Raymond Charles McDonnell ("Plaintiff") for judicial

review of a final decision by the acting Commissioner of the Social Security Administration

("Commissioner") regarding Plaintiff's entitlement to Social Security Disability Insurance

("SSDI") benefits pursuant to 42 U.S.C. § 405(g). Plaintiff challenges the Commissioner's

decision denying him such benefits, which is memorialized in a November 26, 2013 decision by

an administrative law judge ("ALJ"), on the asserted ground that the ALJ erred in concluding

that Plaintiff's mental impairments of depression and anxiety were not severe.[1] Plaintiff has

moved for judgment on the pleadings requesting that the Commissioner's decision be reversed,

---

[1] Because neither party disputes the ALJ's evaluation of Plaintiff's physical impairments, the
court will limit its discussion and analysis to Plaintiff's mental impairments.

or, in the alternative, remanded for further proceedings (Dkt. No. 11). The Commissioner has moved for an order affirming the decision of the Commissioner (Dkt. No. 15).

The parties have consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the following reasons, the court allows Plaintiff's motion in part and directs a remand to the Commissioner for additional evaluation of the evidence in light of this decision and, if necessary, additional development of the evidence. The court denies the Commissioner's motion.

      II.     <u>Procedural Background</u>

On April 13, 2009, Plaintiff applied for SSDI, alleging a March 14, 2006 onset of disability (Administrative Record ("A.R.") at 13, 185-186, 258). The application was denied initially and on reconsideration (*id*. at 73-75, 80-82). Plaintiff requested a hearing before an ALJ, and one was held on May 3, 2011 (*id*. at 37-70, 83-84). Following the hearing, the ALJ issued a decision on June 6, 2011, finding that Plaintiff was not disabled and denying Plaintiff's claim (*id*. at 10-24). On September 8, 2011, the Appeals Council denied review and affirmed the ALJ's decision (*id*. at 1-5). Plaintiff then sought judicial review, and, on July 23, 2012, based on the parties' agreement, another session of this court issued an order reversing the ALJ's decision, remanding the case for further administrative proceedings, and entering judgment for Plaintiff (*id*. at 755-759). Following a new hearing in front of the same ALJ on August 13, 2012, the ALJ issued a new decision on November 26, 2013, again finding that Plaintiff was not disabled and denying Plaintiff's claim (*id*. at 676-694). The Appeals Council denied review on March 4, 2015 (*id*. at 667-670). Thus, the ALJ's decision became the final decision of the Commissioner. This appeal followed.

III.   Legal Standards

A.   Standard for Entitlement to Social Security Disability Insurance

In order to qualify for SSDI, a claimant must demonstrate that he was disabled within the meaning of the Social Security Act prior to the expiration of his insured status for disability insurance benefits.  *See* 42 U.S.C. § 423(a)(1).  A claimant is disabled for purposes of SSDI if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 423(d)(2)(A).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated under the statute.  *See* 20 C.F.R. § 404.1520.  The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id*.  *See also Goodermote v. Sec'y of Health & Human Servs*., 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the

hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. *See* 20 C.F.R. § 404.1520.

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's "residual functional capacity" ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work. *See id.* "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996). "Work-related mental activities generally … include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." *Id.* at *6.

The claimant has the burden of proof through step four of the analysis. At step five, the Commissioner has the burden of showing the existence of other jobs in the national economy that the claimant can nonetheless perform. *Goodermote,* 690 F.2d at 7.

B. Standard of Review

The District Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). The court reviews questions of law *de novo*, but must defer to the ALJ's findings of fact if they are supported by substantial evidence. *Id.* (citing *Nguyen v. Chater*, 172

F.3d 31, 35 (1st Cir.1999)).  Substantial evidence exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence.  *Id.*  So long as the substantial evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably could support a different conclusion."  *Id.* at 770.  That said, the Commissioner may not ignore evidence, misapply the law, or judge matters entrusted to experts.  *Nguyen*, 172 F.3d at 35.

IV.   Discussion

A.  The Evidence

1.  Plaintiff's Application

On March 14, 2006, Plaintiff's alleged onset date, Plaintiff was working as a laborer in a food service warehouse when he was struck from above by a falling pallet of frozen beef.  He lost consciousness and sustained fractures to both bones of his lower right leg and to his lower back (*id.* at 307).  It was as a result of the physical impairments stemming from these injuries to Plaintiff's leg and back that Plaintiff initially applied for SSDI.  According to Plaintiff, his injuries prevented him from working because they rendered him unable to bend, lift, stoop, or crawl (*id.* at 13, 185-186, 258-265).  At the time he applied for SSDI benefits, Plaintiff did not claim to have any mental impairments that impeded his ability to work (*id.* at 258, 261).

2.  <u>Medical Records</u>

Records from Baystate Medical Center, where Plaintiff was treated immediately after the

March 14, 2006 accident, note that Plaintiff had a history of anxiety disorder (*id*. at 351), and

that family members reported Plaintiff as having "fairly significant problems with anxiety" (*id*. at

348).  One of Plaintiff's surgeons described Plaintiff the day after the accident as being "quite

anxious, but … appropriate," insofar as he was in no acute distress, was alert and oriented, and

presented with an appropriate mood and affect (*id*. 349).  Records from Weldon Center for

Rehabilitation at Mercy Medical Center, where Plaintiff was transferred following his initial

medical treatment at Baystate, reflect that Plaintiff underwent a psychiatric consultation on

March 24, 2006 (*id*. at 507-509).  The psychiatrist who provided the consult noted that Plaintiff

presented with a history of anxiety disorder and diagnosed him with "anxiety disorder by

history" and "rule out paranoid personality disorder," but the physician was unable to fully

evaluate Plaintiff based on Plaintiff's unwillingness to engage for more than five minutes (*id*.).

Plaintiff did not seek any mental health treatment until March 11, 2011, five years after

the accident and nearly two years after he applied for SSDI benefits.  At the time, Plaintiff went

to Mt. Tom Mental Health Center ("MTMHC") for an intake assessment, having been urged by

the "people around him … to get some help" with his feelings of anxiety and depression around

his future ability to support himself (*id*. at 658-666).  The clinician who conducted the one-hour

assessment indicated that Plaintiff exhibited symptoms of depressed mood, decreased

concentration and memory, and anxiety, and assessed Plaintiff as suffering from a marked

impairment in the categories of concentration, sleep habits, and "hobbies/interests/play" (*id*.).

The clinician diagnosed Plaintiff with a mood disorder due to general medical condition with

depressive features, assigned him a Global Assessment of Functioning Score of 51,[2] and recommended weekly psychotherapy sessions to reduce Plaintiff's symptoms of depression and anxiety and to increase his ability to focus and concentrate (*id.* at 666).

Records of Plaintiff's weekly psychotherapy sessions are not part of the administrative record, save for a single record from July 27, 2011, in which Plaintiff's diagnosis and GAF score remain unchanged, and the clinician notes that Plaintiff "continues to struggle with dealings [sic] of anxiety and hopelessness" and that his ability to focus is "markedly limited because of his worry about the future and his ability to sustain himself financially" (*id.* at 928-931).

Plaintiff also underwent a medication evaluation at MTMHC at about the same time, on July 19, 2011, and his medication management records are part of the record (*id.* at 925-927). The psychiatrist who conducted the one-hour evaluation observed that Plaintiff was well-groomed and his thoughts were logical and coherent (*id.* at 926). While Plaintiff's mood appeared a "bit anxious and angry," his judgement and impulse control appeared to be good, his cognition was grossly intact, he was oriented in all spheres, and his concentration and memory appeared to be within normal limits (*id.*). The psychiatrist diagnosed Plaintiff with major depressive disorder, single episode, severe without psychotic features, and anxiety disorder not otherwise specified, assigned him a GAF of 50, and prescribed Celexa, an anti-depressant, as well as trazadone as a sleep aid (*id.* at 925-927). During five 20-minute medication management sessions falling between the evaluation and April 17, 2012, Plaintiff consistently presented as well-groomed and with good eye contact and coherent verbalizations (*id.* at 910-927). The

---

[2] GAF scores are expressed in terms of degree of severity of symptoms or functional impairment, with scores of 41 to 50 representing "serious" severity, scores of 51 to 60 representing "moderate" severity, and scores of 61 to 70 representing "mild" severity  *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders,* 32–34 (4th Ed. Text Revision 2000).

psychiatrist gradually increased Plaintiff's dose of Celexa and replaced his prescription for trazadone with one for Ambien (*id*. at 909-924).  By the time of Plaintiff's final medication management session on April 17, 2012, the psychiatrist described Plaintiff as displaying more spontaneous verbalizations and having a brighter affect and indicated that his mental status "appeared happier, less angry and depressed" (*id*. at 911).

### 3.   Plaintiff's Testimony

At the August 13, 2013 hearing, Plaintiff testified that he started to feel symptoms of depression and anxiety "a little before" the March 14, 2006 accident, but increasingly after the accident (*id*. at 726).  He affirmed that it was at the urging of friends and relatives that he sought treatment at MTMHC in March 2011 (*id*. at 726).  While Plaintiff testified that he continued to struggle with depression and anxiety as of the hearing, he also testified that, from January 2012 through April 2013, he stopped going to therapy and taking medication for his mental health conditions (*id*. at 708-710, 712-714).  Plaintiff attributed the cessation of mental health treatment to the fact that he began taking prerequisites and courses in a clinical lab science program as part of a vocational rehabilitation effort (*id*.).  He testified that he was "achieving good marks" from January 2012 until January 2013, at which time he began to experience anxiety attacks and insomnia (*id*. at 708-709, 714).  According to Plaintiff, as a result of a lack of sleep, he failed a hematology final in May 2013 and was involuntarily withdrawn from the program, although he had put in an appeal to be readmitted (*id*. at 709-710).  Plaintiff resumed therapy with a different therapist in April 2013, and his primary care physician was prescribing him mental health medication until he could get an appointment with a psychiatrist (*id*. at 713, 727).

In terms of function, Plaintiff testified that he prepared some of his meals and did small loads of laundry and small grocery trips himself, while his mother and sister provided him with

some meals and helped him with larger loads of laundry and larger grocery trips (*id*. at 717, 728).

Plaintiff testified that he took care of his own hygienic needs, bathing and showering on his own,

and used the internet for school work (*id*. at 717-718).  Plaintiff testified that he left home for

school, to visit relatives, and, occasionally, to go to the sauna at the Elks Club (*id*. at 717).

Plaintiff testified that his anxiety caused him problems with concentration and memory (728-

729).

### 4.  Expert Testimony

Herbert Golub, Ph. D., DABPS, a psychologist assigned by the Commissioner to review

Plaintiff's records, testified at the August 13, 2013 hearing (*id*. at 699-705).  Based on Plaintiff's

MTMHC treatment records, Dr. Golub opined that Plaintiff met the listing for 12.04 Affective

Disorders as of 2012, but, given the lack of earlier mental health treatment or records, he had no

way of assessing or forming an opinion as to the severity of Plaintiff's mental impairments

before that time (*id*. at 702).  On questioning by Plaintiff's attorney in which she pointed out that

Plaintiff's initial intake at MTMHC was in March 2011, the medical expert revised his

testimony, stating, "I'd be willing to … say [that he met the listing for 12.04 Affective Disorders

in] 2011 (*id*. at 704).  When the ALJ inquired of Dr. Golub's assessment of the Paragraph B

criteria, Dr. Golub testified that Plaintiff was moderately restricted in the activities of daily

living, had no difficulty maintaining social functioning, had moderate difficulty maintaining

concentration, persistence, or pace, and had no episodes of decompensation (*id*. at 702-703).

The ALJ appeared to recognize that under this assessment Plaintiff failed to meet the 12.04

listing (which would require at least two marked limitations or one marked limitation and

repeated episodes of decompensation, each of extended duration), but did not press Dr. Golub on

the apparent discrepancy in his testimony (*id*. at 704).

B.  The ALJ's Decision

To determine whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations.  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity from his alleged onset date, March 14, 2006, through his date last insured, December 31, 2010 (A.R. at 681).[3]  At steps two and three, the ALJ found that, through the date last insured, Plaintiff had multiple severe physical impairments, but no severe mental impairments, and concluded that his severe physical impairments, taken separately or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*id.* at 681-682).  The ALJ's findings and conclusions with regard to Plaintiff's mental impairments are contained in a single paragraph in his decision:

> In terms of the claimant's alleged mental impairments, the claimant apparently did not seek counseling until after his date last insured.  Exhibit 24F.  His doctors did not report significant psychological symptoms during his many physical examinations prior to December 31, 2010.  Moreover, when he presented for counseling in March 2011, the claimant was assessed a GAF of 61, indicating mild symptoms/impairments.  Exhibit 24F-4.  Although the record shows that claimant's mental status appears to have deteriorated since that time (Exhibit 28F), this occurred after the specific period relevant to this decision.  The undersigned finds that the claimant's current mental health condition is not reflective of his mental status prior to the date last insured.  Thus, it is found that the claimant had no severe mental impairment.

(*id*. at 682).  Before proceeding to step four, the ALJ found that, through the date last insured, Plaintiff had the RFC to perform light work with the limitations of no more than occasional climbing of ramps and stairs, balancing, kneeling, crouching, crawling, and stooping; no lifting

---

[3] "The date last insured is the last date on which an applicant is eligible to receive SSDI.  To be Title II Disability Insurance Benefit eligible, an applicant must have disability insured status as of the onset date of a disability."  *Pennell v. Colvin*, 52 F. Supp. 3d 138, 141 n.1 (D. Mass. 2014) (citing 20 C.F.R. § 404.131(a)).

or reaching overhead; no climbing ladders, ropes, or scaffolding or work around heights; no more than incidental exposure to extremes of cold or vibration; and no use of left leg or foot controls (*id*. at 682).  At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work (*id*. at 686).  Finally, at step five, relying on the testimony of an independent vocational expert, the ALJ determined that, from the alleged onset date through the date last insured, Plaintiff could perform jobs found in significant numbers in the national economy taking into account Plaintiff's age, education, work experience, and RFC, and, therefore, Plaintiff was not disabled (*id*. at 687-688).

      C.  Analysis

      The court concludes that the ALJ erred in several respects.  First, the ALJ erred in failing to rate Plaintiff's degree of limitation resulting from his mental impairments in the broad areas of functioning, including the activities of daily living, social functioning, maintaining concentration, persistence, and pace, and episodes of decompensation, before making a determination as to the severity of those impairments, and in failing to document his application of the special technique in his decision, as required by 20 C.F.R. §404.1520a.[4]  Second, the ALJ erred in failing to consider whether Plaintiff's mental impairments limited his ability to carry out work-related mental activities in determining Plaintiff's RFC, an analysis an ALJ is required to undertake even if he determines a mental impairment is non-severe.  20 C.F.R. § 404.1545. Accordingly, remand of this case is appropriate for the ALJ to properly apply the law and

---

[4] Indeed, in the remand order from the Appeals Council following the first decision, the ALJ was specifically instructed to "[a]rticulate how he has evaluated the severity of all medically determinable mental impairments under the special technique mandated by 20 C.F.R. 404.1520a. The Administrative Law Judge will explain how the evidence supports his assessments for the broad areas of functioning that are the 'paragraph B' criteria.  As appropriate, he will consider the 'paragraph C' criteria" (A.R. at 763).

regulations to assess the severity of Plaintiff's medically determinable mental impairments utilizing the special technique set forth in 20 C.F.R. §404.1520a.  If he again finds Plaintiff's mental impairments to be non-severe, the ALJ must assess whether the impairments cause any limitations on Plaintiff's ability to carry out work-related mental activities in determining Plaintiff's RFC.

In remanding this matter, the court notes that the ALJ's conclusion that Plaintiff's depression and anxiety were non-severe was based, in part, on a misreading of the factual record. In particular, the ALJ found that when Plaintiff began counseling in March 2011, he was assessed a GAF of 61, indicating only mild symptoms or impairment (*id*. at 682).  However, as noted above, Plaintiff's assessed GAF was 51, a ten-point disparity, representing the difference between mild and moderate symptoms or impairment (*id*. at 661, 663).  The discrepancy is likely attributable to a blurring of the faxed copy of the medical record, which makes the "51" appear as if it might be a "61" on that particular page of the Administrative Record (*id*. at 661).  No such blurring exists on the following pages of the exhibit, however, and it is quite clear the clinician assessed Plaintiff a GAF of 51 in March 2011 (*id*. at 663).  Indeed, in the ALJ's first decision referring to the same exhibit, the ALJ correctly noted that Plaintiff had been assessed a GAF of 51, and he went on to conclude that the Plaintiff's mental impairments were severe (*id*. at 16).

The significance of the ALJ's misreading of the GAF score in his second decision is compounded by the ALJ's finding that Plaintiff's mental status appeared to have deteriorated following his initial evaluation in March 2011, but that the deterioration was not reflective of Plaintiff's mental status prior to his date last insured of December 31, 2010 (*id*. at 682).  As support for the noted deterioration, the ALJ relied on Plaintiff's MTMHC medication treatment records from July 2011 through April 2012, in which the psychiatrist assigned Plaintiff a GAF of

50 (*id*. at 925-927).[5] Given this, the ALJ's finding that Plaintiff's mental status had deteriorated and was not reflective of his status as of his date last insured may have been based, at least in part, on his erroneous belief that Plaintiff's GAF score had fallen from 61 to 50 between March 2011 and July 2011, rather than the single-point reduction (from 51 to 50) that the records actually document.

None of this discussion is intended to suggest that the ALJ must find that Plaintiff's mental impairments were severe or that Plaintiff was disabled as of his date last insured. GAF scores in themselves are not determinative of anything, nor does a GAF score of 50 or 51 "preclude one from having the mental capacity to hold at least some jobs in the national economy, *Smith v. Comm'r of Soc. Sec*., 482 F.3d 873, 877 (6th Cir. 2007), as the ALJ recognized in his first decision (A.R. at 16). It is the province of the ALJ to make findings of fact based on the substantial evidence of record, including not only the medical opinion evidence, including GAF scores, but also Plaintiff's testimony about his functional limitations or lack thereof. However, the ALJ's findings should not be based on a misreading of the record evidence, and the ALJ must utilize the proper legal standards, which he has failed to do.

V.      Conclusion

For the reasons stated above, Plaintiff's motion for judgment on the pleadings (Dkt. No. 11) IS GRANTED in part, and the Commissioner's motion for an order affirming the decision (Dkt. No. 15) IS DENIED.

It is so ordered.

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge

---

[5] These records post-date the first hearing and, thus, were not part of the administrative record of the first decision.